UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,    )
                             ) CAUSE NO.
        Plaintiff,           ) 1:13-cr-226-WTL-DML-1
                             )
        -vs-                 )
                             ) Indianapolis, Indiana
AUSTIN WILLIAMS,             ) October 1, 2014
                             ) 2:00 p.m.
        Defendant.           ) REDACTED TRANSCRIPT

**BEFORE THE**
**HONORABLE WILLIAM T. LAWRENCE**

OFFICIAL REPORTER'S TRANSCRIPT OF

SENTENCING HEARING

Court Reporter:    Cathy Easley Jones, RMR, RDR, FCRR
                   Official Court Reporter
                   46 East Ohio Street, Room 291
                   Indianapolis, IN  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

**A P P E A R A N C E S**

FOR THE GOVERNMENT:          Mr. Steven D. DeBrota
                             Assistant United States Attorney
                             10 West Market Street
                             Suite 2100
                             Indianapolis, IN  46204

                             Ms. Amy E. Larson
                             U.S. Department of Justice
                             1401 New York Avenue NW
                             Washington, DC  20530


FOR THE DEFENDANT:           Ms. Gwendolyn M. Beitz
                             Indiana Federal Community
                             Defender's Office
                             111 Monument Circle
                             Suite 752
                             Indianapolis, IN  46204

*(In open court)*

THE COURT:  Be seated, please.  We are on the record on 1:13-CR-226, United States of America versus Austin Williams.

Good afternoon, Mr. Williams.  Good afternoon to you, Ms. Beitz.

MS. BEITZ:  Good afternoon, Your Honor.

THE COURT:  Mr. DeBrota, how are you?

MR. DeBROTA:  Fine, Your Honor.

THE COURT:  I see you brought reinforcements again.

MR. DEBROTA:  I have.  Do you want me to introduce them, Your Honor?

THE COURT:  I recognize Ms. Larson, but you might introduce for the record the gentleman to my left.

MR. DeBROTA:  This is Special Agent Michael Langeman of the FBI, Your Honor.

THE COURT:  Ms. Larson, will you be handling this matter?

MS. LARSON:  I will, Judge.

THE COURT:  All right.  Ms. Beitz and Mr. Williams, would you approach the podium, please.

Mr. Williams, would you state your full name for the record, please?

THE DEFENDANT:  Austin Brown Williams.

THE COURT:  Mr. Williams, as you recall, on the 30th

1  day of June of this year, I conducted a plea hearing on this

2  case.  At the conclusion of that hearing, I accepted your

3  pleas of guilty to Counts 1, 2 and 3 of the indictment, which

4  charged you with the sexual exploitation of a child as Class B

5  felonies, as well as Counts 4 and 5, which charged you with

6  enticement of a minor, both as class A felonies, as well as

7  Counts 6 and 7, which charged you with distribution of child

8  pornography as class C felonies, and Count 8, which charged

9  you with possession of child pornography as a class C felony.

10           These matters now come on for sentencing, and you

11  understand this is the sentencing hearing in your case?

12           THE DEFENDANT:  Yes.

13           THE COURT:  Ms. Beitz, have you received a copy of

14  the presentence investigation report submitted in this matter?

15           MS. BEITZ:  We have, Your Honor.

16           THE COURT:  Have you had opportunity to go over that

17  with Mr. Williams?

18           MS. BEITZ:  We have.

19           THE COURT:  Mr. Williams, do you think you've had an

20  adequate and sufficient amount of time to go over that report

21  with your counsel?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Very well.  The Court notes that no

24  objections were timely filed by the government to the

25  presentence investigation report; is that correct, Ms. Larson?

1          MS. LARSON:  That is correct, Judge.  We did, as

2   you're aware, file a sentencing memorandum with the Court but

3   no official objections to the PSR.

4          THE COURT:  Ms. Beitz, I see that you have requested

5   a couple corrections in paragraphs 93, 97 and 98.  Do you wish

6   to be heard regarding those?

7          MS. BEITZ:  No, Your Honor.  I just wish them to be

8   corrected within the report.

9          We also noted one other typographical error.

10  Paragraph 11, Your Honor, has the charged time frame as

11  July 8, 2012, to January 24th, 2103.  I believe it should be

12  2013.

13         THE COURT:  Yes.  Ms. Larson, do you see that?

14         MS. LARSON:  Of course, Judge.  No objections,

15  obviously.

16         THE COURT:  We will amend that then by

17  interlineation.

18         Anything else you want to comment on regarding the

19  presentence investigation report regarding its accuracy?

20         MS. BEITZ:  Not with regard to that.  However, we

21  received the supplemental addendum; but I can address one of

22  my concerns in my argument, if that's fine with Your Honor.

23         THE COURT:  Very well.  The only other thing I would

24  like to do -- I would like, Ms. Beitz, for you to specifically

25  look at paragraphs 1 and 2 of that supplemental addendum.  I

1  would be asking if you have any objections to the Court

2  including any of the conditions recited there as conditions of

3  Mr. Williams' supervised release?

4      MS. BEITZ:  Yes, Your Honor.  We will be objecting

5  to 2H.  Specifically, this provision requires that the Court

6  would have to be the entity to decide whether he could have

7  unsupervised contact with a minor; and then the probation

8  officer can decide on supervised release contact.  It seems

9  like that's putting the Court in the position of having to

10  be -- any time he wants to have any contact with his daughter,

11  motion to the Court, motion to the Court.  I think it's more

12  appropriate for a probation officer to be a supervisory

13  authority on that and more efficient for the Court's time.

14      THE COURT:  I note, Ms. Ivie, that we generally

15  elaborate in regards to that special condition, specifically,

16  the one in regards to the unsupervised contact, indicating

17  that there are certain hoops to be jumped through regarding

18  notice and such as that.  Was that not contemplated here?

19      MS. IVIE:  Your Honor, historically, I think the

20  conditions set, you know, that specific condition was not

21  meant to prevent them from having contact with family members

22  or things like that; but when conditions were recently

23  amended, that was the agreed-upon new condition that was

24  brought to the probation office.  So it could be amended as we

25  would like.

1    THE COURT:  Ms. Beitz, do you have suggested wording

2  in regards to that?

3    MS. BEITZ:  That it just simply remove the Court and

4  say the probation officer would be the person to make the

5  decision about unsupervised contact, including the standard

6  statement this is not meant to prevent contact between

7  Mr. Williams and his daughter.

8    THE COURT:  Ms. Larson, any comment?

9    MS. LARSON:  No, Judge.  We have no objection to

10  that amendment.

11    THE COURT:  Very well.  The Court will note your

12  objection then, Ms. Beitz, in regards to that.  Anything else

13  in regards to the conditions, be it special conditions or the

14  usual conditions of supervised release?

15    MS. BEITZ:  No, Your Honor.

16    THE COURT:  All right.  I will then accept the

17  presentence report for the record and incorporate the

18  presentence report as a finding of fact.

19    Mr. Williams, as you and I talked during the plea

20  hearing, the Court is obligated to look at that advisory

21  sentencing guidelines and to make that calculation.  I think

22  you and I discussed that we would talk about that advisory

23  sentencing guideline.  That doesn't complete the analysis by

24  the Court, but that's at least one of the steps that the Court

25  is obligated to take.  Do you remember that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Well, let's take a look then at the advisory guideline calculation; and I believe it begins in paragraph numbered 24 of the presentence investigation report; and I would just simply note again that these guidelines are advisory in nature.

The 2013 manual was used to determine the offense level in this matter.

Paragraph 25 indicates that the counts of conviction here form six separate groups.  Counts 1 through 5 each form their own group, while Counts 6, 7 and 8 are grouped pursuant to Section 3D1.2(d) of the guidelines.

As to group 1, Count 1, sexual exploitation of a child, referencing specifically girl No. 1, the base offense level is determined to be a level 32.  Two levels are added because girl one was 15 years of age.  Two levels are added because you distributed images of girl 1 to girl 2 and 4.  Two levels are added because you misrepresented your identity and used a computer to solicit a minor to engage in sexually explicit conduct.  The adjusted offense level for group 1, Count 1, then becomes 38.

In regards to group 2, Count 2, sexual exploitation of a child regarding girl 2, the base offense level is determined to be a level 32.  Since girl 2 was 14 years of age, two levels are added.  Two additional levels are added

because you misrepresented your identity and used a computer to solicit the minor to engage in sexually explicit conduct. The adjusted offense level for group 2, Count 2, is a level 36.

In regards to group 3, Count 3, sexual exploitation of a child in regards to girl 3, again, the base offense level is a level 32. Two levels are added because girl 3 was 14 years of age. Two levels are added because you misrepresented your identity and used a computer to solicit a minor to engage in sexually explicit conduct. The adjusted offense level then for Count 3, group 3, is a level 36.

In regards to group 4, Count 4, enticement of a minor, girl No. 4, the base offense level is found to be a level 28. Two levels are added because you misrepresented your identity to persuade the minor to engage in prohibited sexual conduct. Two levels are added because the offense involved the use of a computer to persuade, induce, entice, coerce or facilitate the travel of the minor to engage in sexually prohibited conduct. Two levels are added because the offense involved the commission of a sex act. The adjusted offense level for group 4, Count 4, then becomes a level 34.

In regards to group 5, Count 5, enticement of a minor in regards to girl No. 5, the base offense level is found to be a level 28. Two levels are added because you misrepresented your identity to persuade the minor to engage

1    in prohibited sexual conduct.  Two levels are added because

2    the offense involved the use of a computer.

3              Please, turn that off.

4              Two levels were added because the offense involved

5    the use of a computer to persuade, induce, entice, coerce or

6    facilitate the travel of the minor to engage in prohibited

7    sexual conduct.  Two levels are added because the offense

8    involved the commission of a sex act.  The adjusted offense

9    level then for group 5, Count 5, is a level 34.

10             In regards to group 6, Counts 6, 7 and 8,

11   distribution of child pornography and possession of child

12   pornography, the base offense level is found to be a level 22.

13   Seven levels are added because you distributed images of girl

14   No. 1 to a 14-year old with the intention to persuade, induce,

15   entice or coerce the 14-year old to engage in prohibited

16   sexual conduct.

17             Five levels are added because you engaged in a

18   pattern of activity involving the sexual abuse or exploitation

19   of a minor.  Two levels are added because you distributed

20   images of girl No. 1 and girl No. 3 on a computer website and

21   because the offense involved the use of a computer.  Two

22   levels are added because the offense involved approximately

23   100 images.  The adjusted offense level then for groups 6 in

24   regard to Counts 6, 7 and 8 is a level 38.

25             Applying the multiple count adjustment of Section

1  3D1.4, the total number of units is 6.  Because the number of

2  units is over 5, 5 levels are added to the greater of the

3  adjusted offense level, which becomes -- which is a level 38.

4  Therefore, the combined adjusted offense level becomes a level

5  43.

6        Because the offense of conviction is a covered sex

7  crime, the career offender does not apply and the defendant

8  engaged in a pattern of activity involving prohibited sexual

9  conduct, the level becomes a level 48.

10        Two levels are subtracted because you demonstrated

11  acceptance of responsibility for your conduct.  An additional

12  level may be subtracted upon motion of the government that you

13  have assisted the authorities in the investigation or

14  prosecution of your own misconduct.

15        Ms. Larson, does the government so move?

16        MS. LARSON:  Yes, Judge.

17        THE COURT:  The Court will accept the government's

18  motion and allow an additional level to be subtracted.  Total

19  offense level to be determined by the Court is a level 45.

20        Any objection to that calculation, Ms. Larson?

21        MS. LARSON:  No, Judge.

22        THE COURT:  Ms. Beitz?

23        MS. BEITZ:  No, Your Honor.

24        THE COURT:  Having then given careful consideration

25  to the guidelines, the Court will now find that the total

1  offense level of 45 is an appropriate calculation for this

2  offense.

3          Turning our attention briefly to the defendant's

4  criminal history and discussing only those inclusions which

5  have generated points, I see one point being assessed for a

6  misdemeanor criminal mischief case out of Marion County, date

7  of conviction being July the 22nd, 2010.

8          Criminal history, then, score is accordingly one.

9  Any objection to that calculation, Ms. Larson?

10          MS. LARSON:  No, Judge.

11          THE COURT:  Ms. Beitz?

12          MS. BEITZ:  No, Your Honor.

13          THE COURT:  Based upon your criminal history,

14  Mr. Williams, under the guidelines, you have one criminal

15  history point.  Based upon the sentencing table in Chapter 5,

16  part A, of the guidelines, that would place you in a criminal

17  history category I.  I find that that computation is correct

18  and would accordingly note that the advisory guideline range

19  for imprisonment would be life.

20          Before we proceed, I would like to acknowledge

21  several things.  First of all, the sentencing memorandum filed

22  by the defendant in this case, I have read it and will be

23  taking it into consideration when fashioning an appropriate

24  sentence in this case.

25          I would also like to indicate that I have read the

victim impact letters submitted by the government from the
mother of two of the victims in this case, which was submitted
on August the 29th; and I will similarly be taking those into
consideration.

The government made a supplemental submission of
victim impact statements on September 30th, and I have read
those also.

The government has filed its own sentencing
memorandum as a response to defendant's memorandum, which I
have read, reviewed, and will be considering.

I have also read a transcript of girl 5's interview
submitted by the defendant as well as Detective Harper's
interview with John Doe No. 1 and the 911 call from girl 5's
mother, which the latter two were submitted by the government.

Ms. Beitz, how would you like to proceed?

MS. BEITZ:  Your Honor, at this time Mr. Williams
will address the Court.

THE COURT:  Very well.  If you might, move the
microphone a little closer to him, please.

Mr. Williams.

THE DEFENDANT:  I'm ashamed to be here today.  I
never imagined the decisions I made when I was 20 and 21 would
define the rest of my life and cause harm to so many other
people, but it did.  I hurt people who didn't deserve it, and
the only thing I can say is I'm sorry.  I hope this does not

define the rest of my life -- I hope this does not define the rest of your lives and that you can move on and be happy.

It may be difficult to understand; but these girls' relationships to me, I never meant to hurt them.  I felt comfortable with them and liked talking to them, but I made it bad.

I graduated high school as a single parent with legal custody of my little girl.  This was difficult but my family and I helped my daughter ████, to live a better, healthier lifestyle.  My daughter has been emotionally struggling without me.  We're more than just father and daughter.  We're best friends.  She needs me in her life.

Yes, I only done this to myself by being in jail.  I hope to get a second chance.  People make mistakes every day.  What I have done will never happen again for the simple fact being in jail isn't fun and for the people I've hurt, dishonored and disrespected.

I'm 23 years old and have a huge future ahead of me; for instance, college, and beginning of my career.  Fifty years to me is a life sentence.  Incarceration is not one of the healthiest positions to be in emotionally or physically.

The crime I committed was very selfish for not thinking about anyone else's feelings; but every day I'm released from prison, I will be a changed man and will never break the law again for the simple fact that disrespecting the

law places me in jail.  Also, because I don't want to hurt

another person again.  Thank you.

THE COURT:  Thank you, Mr. Williams.

Ms. Beitz.

MS. BEITZ:  These cases are just so sad.  I think no

matter how you look at them and no matter what side of this

courtroom you're sitting on, I think everybody can agree that

these cases leave nothing but destruction and devastation

behind them.  Everything that I am going to say on behalf of

Mr. Williams I want everyone to know is not an effort to

minimize the harm that has been done or to diminish the

seriousness of his conduct.  But it's merely to give the Court

some perspective on what a fair and appropriate sentence may

be in this case and our perspective on some of the facts that

were presented to this Court.

In our sentencing memo, we highlighted three things

we would like the Court to consider.  First, we would really

like the Court to consider Mr. Williams' age.  He stands

before you a 23-year old man.  The government's requested

sentence is a life sentence for him.  The statistics that we

have provided you when it comes to the expectation of

someone's age tells us that his expectation is just over 50

years.  That does not include the diminishing health,

nutrition and the types of things that will be available to

him when he's in prison during that time period.

1    So I've also provided you with a specific cite to a

2  study that talks about how much incarceration does diminish an

3  individual's life expectancy.  So that 50 years is not taking

4  into account what will happen due to the incarceration.

5    This is not a case that deserves life.  As Judge

6  Posner has told us, when making the consideration about

7  whether or not to give someone a life sentence, careful

8  consideration must be looked at, especially in these types of

9  cases.  Is he likely to recidivate the older that he gets?

10    We know from looking at Judge Posner's words that

11  statistically, he is less likely, less likely to recidivate.

12  The urges for these types of offenses go down the older

13  somebody gets.  They don't go up.

14    Because of that, the Court can have and the general

15  public can have that confidence that a lengthy sentence with

16  lengthy supervision following is appropriate rather than a

17  life sentence.

18    As I said, he's 23; and he has a lot of living to

19  do.  He made enormous mistakes.  He hurt many people, but he

20  is very young.  And I know the government has tried to make

21  some hay between the ages of 19 and the ages of 21.  We were

22  all in our twenties once.  People do dumb things in their

23  twenties.  You don't think things through.

24    We've provided you with other statistical

25  information that shows you that the brain -- the area of the

brain that's responsible for making good decisions, for being able to think through everything that you do, doesn't fully develop until you're in your early twenties.  Some studies even say up to 25.  And you would know that because you can't even drink till you're 21.  You can't rent a car until you're 25.

So it's commonly understood that we don't make the best decisions in our young twenties.  That doesn't mean that we don't have to pay for those decisions that we make then, but it puts in perspective what kind of a person he can be in ten years.  He can easily bounce back from this, especially with a lengthy sentence in the Bureau of Prisons.  The Bureau of Prisons specialized in taking care and treating individuals like Mr. Williams.  They have programs in place to do that.

We ask the Court recommend placement in one of those programs.  Specifically, we ask the Court to recommend that he be placed at the Marion, Illinois, facility.  That facility has both the residential sex offender management program as well as the nonresidential.  And because of that, he would -- had the hope of being able to complete both of those.  And I do note that it requires a recommendation from the Court and also a volunteer statement from Mr. Williams, and he does volunteer to participate in those statements.

He would qualify for participation in the residential program because there has been a contact offense.

So he does qualify for both. Normally, you don't qualify for the other without having a contact offense. However, he would in this case qualify for both. So we ask that the Court make that recommendation.

Looking at the government's response that they filed yesterday regarding recidivism -- and I know that Ms. Larson will likely touch on this -- they cited Your Honor to a study, a study that talks about the recidivism involving pedophiles. I actually pulled that study; and I wanted to make clear that it is our belief that study has nothing to do with this case, and I'll you why, because this related specifically to pedophilia.

Pedophilia is a medical diagnosis. It's a diagnosis that has not been given in this case, first of all. Nobody in this room is a doctor with the ability to say that he is a pedophile.

Second, it doesn't qualify by the definition that was utilized in the study. In this particular study, it was defined -- they said -- this study involved pedophiles. A pedophile is an individual who fantasizes about, is sexually aroused by or experiences sexual urges toward prepubescent children, generally under 13 years. That prepubescent child is what defines a pedophile from something else, like, for example, a hebephile. Hebephilia is the attraction to teenagers, somebody who is post -- has started the puberty

1  process.  That's what you're dealing with in this particular

2  case.

3        We're not dealing with images of children who have

4  not developed.  You're not dealing with an attraction to

5  children who have not developed.  We're talking about children

6  who have developed.

7        Now, while they are children under the law, they are

8  minors under the law, it does make a difference in looking at

9  what the government's going to point you to, to arguing that

10  he is somebody who is likely to do this again; and, therefore,

11  you need to put him away for 50 years.

12        I point Your Honor specifically to two other things

13  that are listed in that article that the government asks you

14  to look at.  Those were some of the footnotes that were

15  listed.  Specifically, I'm looking at 91 and 97.  Those were

16  the abstracts from the two cited individuals in the study,

17  Hanson and Morton.  What they tell us in this is that a

18  meta-analysis of 82 recidivism studies, 1,620 findings from

19  29,450 sexual offenders identified deviant sexual preferences

20  and antisocial orientation as the major predictors of sexual

21  recidivism for both adult and adolescent sexual offenders.

22  Antisocial orientation was the major predictor of violent

23  recidivism and general recidivism.

24        So I looked at antisocial disorder to see whether

25  that would qualify in this particular case.  Looking at the

1 diagnostic criteria for that, it requires that there be

2 evidence of the conduct disorder with onset before age 15

3 years. We don't have that in this case. Mr. Williams would

4 not qualify for antisocial personality disorder.

5 So when the government is citing this article to

6 you, it's important to read the entirety of the article and

7 look at what's actually being talked about because this does

8 not apply to Mr. Williams. This applies to individuals who

9 are attracted to prepubescent children under the age of 13.

10 Second, in their abstract at note 97, the research

11 tells them that the observed rates underestimate the actual

12 rates because not all offenses are detected, when talking

13 about sexual offenses. However, the available research does

14 not support the popular notion that sex offenders inevitably

15 reoffend. Some sexual offenders are more dangerous than

16 others.

17 So just simply saying I'm going to cite an article

18 and, therefore, you should assume that he is somebody who is

19 likely to recidivate requires a lot more than just a snippet

20 of an article, Your Honor. It requires looking at the

21 totality of it. In this particular case, we believe that that

22 should not be persuasive to you.

23 While Mr. Williams engaging with these girls was

24 absolutely wrong, this is different than engaging with

25 children of two or three or four. It's a totally different

1 situation. These young ladies were postpubescent. He should

2 not have been interacting with them. I'm not saying that he

3 should. I'm simply saying that his attraction to a woman who

4 is physically developed is far different than an attraction to

5 a child and needs to be treated far differently in the Court's

6 determination.

7 And that draws me to the factor in looking at the

8 need to avoid unwanted -- unwarranted sentence disparities.

9 Much has been talked about with regard to the Shea case and

10 all of the documents provided to you. Your Honor is in the

11 best position to understand that case because you sat in

12 judgment on it.

13 But from being able to read from what I've been able

14 to find from the appellate court, Mr. Shea was 19 years old.

15 Mr. Shea had 10 victims, which is similar to this case.

16 Mr. Shea took it a step further, though. When he was released

17 on pretrial conditions, he continued to offend and actually

18 involved more victims in that particular case.

19 Additionally, Mr. Shea had a collection of

20 prepubescent child pornography as well as the pornography that

21 he had produced. That was a key difference. So that was

22 something that I think the Court mentioned in that. He also

23 had a huge amount of prepubescent child pornography. That's

24 different than this case.

25 In looking at some of the similarities -- and we

note some of the differences.  The deviant behavior that I
talked about from the abstracts of the article, that was
present in the Shea case.  It was specifically noted by the
appellate court that in Shea, he had required that one of the
victims in that case actually physically abuse another victim
on camera for his own pleasure.  That would qualify as
something that would be noted in the literature as deviant
behavior.  We don't have that in this particular case.

He was asking them to do things, expose themselves,
send pictures.  Absolutely he shouldn't have been doing it,
but that's different than having somebody harm another person
in the picture or by have somebody do degrading things in the
pictures.

Your Honor has seen the effects of that in another
case you sat in judgment on, United States versus Finkbiner.
In that case, there was degrading things that were being asked
of the victims.  There were over 100 victims in that
particular case.

What Your Honor saw there, he was asking them to
harm themselves, to do things that were degrading,
humiliating.  That's not what you have in this particular case
either; and that defendant, his sentence was 40 years.

The final case I ask the Court to consider was the
Newton case.  You were not the judge in this case, but the
facts are far more egregious than what you're dealing with

here.  It was an older gentleman -- he was in his forties --
who had purchased a child, purchased a child from the black
market for the purpose of raising that child in boy love and
loaning him out to his friends to produce child pornography
all over the world.

They had also trained that child to go undetected
when he was questioned about it.  So they had taken this much,
much further; and in that particular case, he was only given
40 years, and he didn't even receive a lifetime of supervision
for that.

So in looking at the need to avoid sentence
disparities, we do believe that an appropriate sentence in
this case is between 15 and 25 years.  We recognize 15 is the
mandatory minimum, and that may be appropriate in some
particular cases.  We ask you to consider his age in looking
at that, but I do think a range of 15 to 25 years would
certainly ensure that he stays in jail until each one of these
victims is past the age of minority.

These victims will be well into their lives and
hopefully, as he said, on to happier times, and they will not
have to be concerned about him being able to contact them
because Your Honor will put such restrictions on his
supervised release conditions.

Finally, with regard to the factual things, I know
that I talked at great length about my concerns with girl 5's

account.  Your Honor is not in a position to have to make a
determination whether or not that sexual contact was
consensual or not consensual.

We provided those facts to you in hopes that you
would see that while his conduct was wrong and he shouldn't
have been doing it at all, that there certainly is an argument
that it was, in fact, consensual.  Certainly embarrassing for
girl 5 if at some point in time if she would feel like she
needed to admit that; but regardless, her behavior does not
meet the accusations.

You saw with regard to their first encounter,
somehow she says her pants came off and then ended up in a
container in his closet, which doesn't make sense at all to
this description of a violent encounter where she's being
thrown on a bed.  That doesn't make sense.

And I know that this Court is familiar with
credibility instructions, and what this Court would tell a
jury listening to it is they are to consider to what extent a
witness's testimony is supported by or contradicted by other
evidence in the case and to what extent they're able to
accurately recall and relate events that happened to them.
Her story has shifted depending on who she tells it to and
when she tells it.

With regard to the forcible rape allegation, we gave
Your Honor those pictures.  If, in fact, Mr. Williams was

1 intending that night to perform some kind of forcible sexual

2 act on this girl, he would not do it at that location. It's

3 right on the street. You can see through that fence. There

4 are any number of windows that look right into that backyard;

5 and he would have known that, based on the government's theory

6 of the case. He would have absolutely known that her parents

7 were home because she had noted she was going to have to sneak

8 out.

9 If he were intending to perform some kind of a

10 forcible sexual encounter with her, that would not be a place

11 because one scream, one scream and it's over. He's caught,

12 red-handed. But instead, as she describes, this goes on for

13 five, six, seven minutes while they're out there in plain

14 view. Anybody could have looked out a window and seen it and,

15 if the struggle had happened the way she describes, would have

16 heard it. But you don't have any of that in this particular

17 case. So we ask the Court to consider that.

18 In support of Mr. Williams' statement that he did

19 believe, while wrongfully, that these young girls, he was in

20 relationships, friendships with them, you see the account

21 that's brought to you regarding girl 4. Now, girl 4

22 describes -- and I believe it's in Exhibit 4 that the

23 government provided to you. A lot of interaction with him

24 over a long period of time, including what could fairly be

25 described as dates, picking her up, taking her to movies,

1 calling him after she says that she -- and asking him for a

2 ride to places after she says that he has forced himself on

3 her and she didn't know what to do; she was so scared.  But

4 that's definitely different than the actions that you see

5 there.

6 You see her actually reaching out to him again for a

7 ride, going to a movie with him, still communicating with him,

8 even after she began to realize that he was not Dorisha, as

9 she put in her statement, which is Exhibit 4.  She continued

10 to communicate with him and ask him for rides.  Again, that

11 shows that while this was absolutely wrong, there were

12 certainly friendships that were developing; and Mr. Williams

13 was the adult, and he should not have been involved in that at

14 all.

15 But it puts in context the difference between his

16 conduct and the conduct you saw in Finkbiner and the conduct

17 that you saw in Shea.  He's not forcing these girls to degrade

18 themselves on camera.  He's not forcing them to get into cars

19 with him.  He's not forcing them to go to movies with him.

20 These were relationships in a sense of the word.

21 Again, I'm not trying to diminish the seriousness of

22 it; but it is different than grabbing somebody off the street

23 and throwing them in the back of your car and dragging them to

24 your apartment.

25 With those things in mind, I ask the Court to

1 consider a sentence between 15 and 25 years as sufficient but

2 not greater than necessary for Mr. Williams' age, what he

3 actually did, the ability for him to get help during that time

4 period and sufficiently be able to get help during that time

5 period.

6 THE COURT: Thank you, Ms. Beitz. If you and

7 Mr. Williams would take your seats for a moment, I would like

8 to hear from the government.

9 Ms. Larson.

10 MS. LARSON: Thank you, Judge. Before we begin

11 today, I would like to bring to the Court's attention that we

12 do have family members of the victims here. We do have family

13 members of girl No. 4 and girl No. 5 seated in the courtroom

14 today, Judge. They are here in support of the minor victims

15 in this case and to talk -- and to communicate through their

16 presence the severity of the impact that this offender's

17 actions had on children.

18 As you know, Judge, and as acknowledged by defense,

19 the crimes charged in the indictment are extremely serious.

20 You have an offender that now stands before you at 23 who was

21 an adult, in his early 20s, when he relentlessly searched for

22 young girls on line. He targeted them. He used extremely

23 deceptive and manipulative means. He didn't truly represent

24 who he was, that he was a 20-year old adult male. He,

25 instead, created not one but two fictitious Facebook accounts

where he pretended to be a teenage girl in communicating.

Through that deception and through those lies, he encouraged and coerced the production of child pornography, which he then distributed to minors in order to trick those minors into producing additional child pornography, all for his own sexual satisfaction.

But it was worse than just that, Judge, because he sought to expose and humiliate numerous young girls. You do have in the government's sentencing memorandum extensive Facebook messages, extensive chats, where he threatens the girls repeatedly in order to obtain additional images of child pornography, where he threatens to publicize these images by posting them online if they don't meet his demands, if they don't produce additional child pornography, if they don't agree to meet him online.

So he distributed these child pornography images publicly on Facebook profiles to shame and humiliate these young girls; and that conduct in and of itself would demand a stringent sentence, a sentence far more stringent than the 15 to 25 years the defense is asking for in this case.

However, what sets this offender apart even from Shea and even from Finkbiner, which defense is relying heavily on, is that the defendant's actions here were not confined simply to the Internet. These were not just online offenses. This is an offender who had direct contact with three separate

minors, three girls under the age of 18. He attempted to
assault one. He engaged in sexual conduct which was illegal
with a girl who was as young as 13, and I will address that
victim specifically in a moment; and then it's the government
position and what is supported by the various documents
submitted in the government's attachments, both to the
original sentencing memorandum and in our response filed
yesterday, that this was not consensual, that this was, in
fact, a forcible encounter.

Now, defense would ask that a sentence for 15 to 25
years being appropriate because of this offender's young age.
I would first point out that this is not someone that stood
before the Court today with a spotless record. The Court is
aware of his prior criminal contacts, some of which resulted
in convictions, others which were prior arrests under the age
of 18.

But they also cite studies about the area of brain
development. Again, the defendant's own actions work against
him here because this is an offender who had a very elaborate
scheme or plan. Again, he was not acting as himself. He was
representing himself not through one false identity but two.
He created and maintained two fictitious profile accounts
which he continuously stocked with sexually explicit photos of
minors as well as adult females, and he continued this pattern
of ongoing manipulation and deceit and trolling the Internet

1  for over a year using this rather complicated scheme, which

2  seems to again contradict the defense argument that there is

3  somehow a lack of brain development, sophistication or

4  maturity with this offender.

5      The defense also takes issue with the

6  characterization of this offender as a pedophile.  The problem

7  with that, Your Honor, is that one of his victims, girl No. 4,

8  was 13 years old at the time the sexual activity began.  This

9  is a young girl who our law enforcement witnesses have met who

10  was extremely small in stature, had little to no body

11  development and, in fact, looked far more childlike than an

12  adult.  No one would confuse girl No. 4 with an adult.  So

13  that diagnosis has some merit at least with respect to that

14  one victim.

15      Again, with respect to whether or not he's diagnosed

16  as antisocial or antisocial personality traits, you're clearly

17  dealing with an offender here who engaged with multiple

18  victims using multiple methods of communication, using deceit,

19  manipulation, coercion, threats, extortion, who has little to

20  no impulse control and, in fact, reacted violently with

21  respect to one of those victims.

22      Judge, the impact on the victims here cannot be

23  understated.  As this Court is aware, these sextortion-type

24  offenses often lead to very tragic results.  You have

25  information about girl No. 6, who the defendant, again, using

1  these deceitful methods, tricks her into taking sexually

2  explicit photos and sending them to him.

3           You have the ongoing communications there where when

4  she refuses to meet him in person, as punishment, he posts

5  sexually explicit pictures of this 17-year old girl on

6  Facebook and threatens to post even more if she won't comply

7  with his demands.

8           Even though she sends him additional pictures, in

9  response, you're aware that the defendant posted the entire

10 series of images; and you're aware that people at this girl's

11 school saw these images, taunted and bullied her, which

12 resulted in this young girl threatening suicide.

13          You've also mentioned, Judge, that you've had the

14 opportunity to read the victim impact statements.  As you can

15 see, it's a prevalent theme of the traumatic impact that the

16 defendant's actions had on these young girls.

17          In the impact statement dated July 23rd that the

18 Court has read -- this is from the parents of girl No. 3 --

19 they talk about how the defendant has caused a break in their

20 daughter's life and in the family that they don't know ever

21 could be truly fixed; that she is attending weekly sessions

22 and therapy to try to regain her trust in other people, to

23 regain the damage to her self-esteem.

24          And they indicate how not just the defendant has to

25 live with this for the rest of his life but that this young

1  girl has to live with what has happened to her for the rest of

2  her life.  In fact, they say that the defendant has stolen

3  their daughter's innocence.

4          You also have an impact statement from the mother of

5  girl No. 4, which is dated July 21st, 2014, which again

6  details the damage that the defendant caused mentally,

7  emotionally and physically to this young girl and talks about

8  the fact that this had a dire impact on her ability to

9  concentrate in school, her ability to focus, and that she too

10  has undergone counseling as a result of this.

11          I think that the probably most chilling thing about

12  this case, Your Honor, is girl No. 5.  Now, the defendant and

13  the defense paints a picture of this defendant having

14  relationships with these young girls, which, again, the

15  problem here is that he was constantly misrepresenting his

16  identity; and he was using these false identities for the

17  first time to coerce or trick girl No. 4 to get in his car.

18          And certainly, when he set up a meeting with girl

19  No. 5, he was using a separate fictitious identity.  She

20  believed she was meeting a young girl.  The text messages are

21  quite clear.  She was not aware she was leaving her home at

22  night to meet a 21-year old offender.

23          And as a result of that, Judge, unfortunately for

24  the defendant, the beginning of this incident was heard by a

25  third party.  You've had the opportunity to read law

1  enforcement's interview with an ear witness to this case who

2  repeatedly heard the victim telling this offender, "Get away

3  from me.  I'm going in the house.  Get off of me."

4         You have prompt outcries to that witness as well as

5  to girl No. 5's mother in a tearful state indicating that she

6  had been raped.

7         And if you look again at the victim impact statement

8  that the Court recently received this week, this is a victim

9  impact statement that was filed with the Court on

10  September 29th, 2014, which details both from the mother's

11  point of view as well as from the victim herself what has

12  happened as a result of this incident.

13         This girl has been seeing a psychiatrist.  She lives

14  in constant fear that she has contracted some sort of sexually

15  transmitted disease from the defendant, that there has been

16  extreme damage done to this family.

17         And you heard from the victim herself, girl No. 5,

18  who talks about as a result of the defendant's actions, not

19  only does she feel anger; but she feels guilt and depression.

20  She's troubled by nightmares and again, another victim who

21  expresses thoughts of suicide as a result of this adult

22  offender's actions.  She details how during the incident she

23  was telling the defendant "no," but he wouldn't stop and that

24  she was crying the entire time.

25         Additionally, at the end of her statement is perhaps

1 the most powerful, Judge.  She talks about how she would like

2 for this offender to go to jail for a long time; and exactly

3 as the government has been arguing, this is an offender who

4 preyed upon young girls for a long time.  So it's the

5 responsibility of the government and the Court once these

6 offenders are caught to punish these offenders so that they

7 cannot reoffend, so that they cannot hurt someone.

8          Judge, in light of the totality of this offender's

9 conduct, the tremendous impact that it has had on the victims,

10 we would ask for a sentence closer to 50 years than the 15 to

11 25 this defendant does seek.

12          And citing the need to avoid unwarranted sentencing

13 disparities, again, the defendant in Shea was younger than

14 this offender when he began his conduct; and he did not engage

15 in hands-on offending.  His actions were confined to the

16 Internet, which, in fact, does distinguish him from

17 Mr. Williams.  In fact, it makes Mr. Williams far worse and a

18 much greater threat if he is to be released.

19          The one last thing that I will ask, Judge, is that

20 we believe and as you saw in the most recent victim impact

21 statement, that there has been financial loss suffered by girl

22 No. 5's family as a direct result of some of the medical care,

23 psychological care that she has encountered.

24          Now, at this point, she estimates that that loss may

25 be around $5,000.  We would be seeking a date not to exceed 90

1   days from today for a final determination of this Court on the

2   issue of loss for restitution order pursuant to 18 USC 3663(a)

3   and then the provision which allows that 90-day period,

4   3664(5), this is the mandatory restitution for certain victims

5   of crime act; and it is our position that 2422(b), which is

6   the offense of conviction, is indeed a crime of violence.

7          If you could give me one second, Your Honor.

8          THE COURT:  Yes.

9          MS. LARSON:  Judge, as we did -- I apologize, Your

10   Honor.  As we did ask in our sentencing brief, we would also

11   ask for a lifetime term of supervised release.  In the nature

12   of the defendant, the totality of the circumstances in these

13   types of offenses, we find that that is necessary.  Thank you.

14          THE COURT:  Thank you, Ms. Larson.

15          Ms. Beitz, if you and Mr. Williams will approach,

16   please.  Anything further, Ms. Beitz?

17          MS. BEITZ:  Your Honor, yes.  I just wanted to make

18   five points quickly.

19          First, Ms. Larson talked about this elaborate scheme

20   or plan in reference to my arguments regarding Mr. Williams'

21   age.  I would like to point out that this elaborate scheme or

22   plan was so elaborate that a 13-year old girl was able to

23   figure it out quite quickly.  If you look at Exhibit 4, she

24   knew very early on who she was talking to and who she was

25   dealing with.

1    Second, the evidence you have before you shows that
2  he was mixing them up.  I mean, if it was so elaborate and so
3  embedded in him to come up with this plan and scheme, he
4  wouldn't have been mixing up the two girls.  He used common
5  things that are utilized by individuals in their early
6  twenties and teenagers to commit this offense, Facebook,
7  texting.  Again, he was so unsophisticated with it that he
8  would forget which girl was texting from which number; and
9  these girls quickly figured out what he was doing.

10    Impulse control, I agree he has low impulse
11  control.  We pointed out that that is scientifically
12  understandable considering his age.  That's something that
13  comes with age.  Everybody gets that maturity the older that
14  they get, especially if you're placed in a treatment program
15  like Mr. Williams is asking that Your Honor recommend for him.
16  The Bureau of Prisons is very good at helping these
17  individuals come up with the tools they need to be able to
18  control their impulses and become productive members of
19  society.

20    With regard to the ear witness, I think Your Honor
21  read carefully that that statement was made as many times as
22  he could say "I don't have to come to court, do I?  Nobody's
23  going to hear about this, will they?"  I think that certainly
24  calls into question perhaps his credibility.  That statement
25  has never been tested under cross-examination; and it,

1    interestingly enough, cuts off during the time that she's
2    saying that there's this enormous struggle.  I ask the Court
3    to put that in perspective.
4           Second, the mom's tearful statement, if you look
5    carefully at the transcript that they provided to you, what
6    you see there is a statement -- a recording of the mother the
7    day after in which she is actually driving to Mr. Williams'
8    house and looking at his car outside of the house and calling
9    the police and saying, "My daughter just led me here to show
10   me where she had been with him the times before this alleged
11   rape happened," again, showing that she knew very well where
12   she was going.  She had been there enough times she was able
13   to lead her mom back to his apartment and say that's where he
14   lived.
15          So that statement that was filed yesterday is
16   actually from the day after from the mom calling and saying,
17   "He's in his apartment.  Come and get him now."
18          Finally, Ms. Larson argued that with regards to
19   Shea, the fact that Mr. Williams is a hands-on offender makes
20   him a greater threat.  I think that in this particular case, I
21   think what made Shea a greater threat was his inability to
22   rehabilitate at all.  He was put on release conditions; and
23   immediately, he was out creating more victims, not just one
24   but multiple victims.
25          So there are always going to be differences in

1   cases.  That's the entire heart of 3553(a) is that Your Honor

2   has to look at the whole person making this decision, but I do

3   believe that there are factors that were present in Shea that

4   made him a greater threat.  Thank you.

5         THE COURT:  Thank you, Ms. Beitz.

6         Mr. Williams, you and I talked at the guilty plea

7   hearing about those things that the Court considers.  We've

8   talked today about the advisory sentencing guidelines; and we

9   indeed have run the calculation, which would indicate that

10  pursuant to those advisory guidelines, that a life sentence

11  would be appropriate in this case.  But as you and I talked at

12  the plea hearing, that does not end the Court's consideration

13  of what might be appropriate.

14        We must also look to those factors of 3553(a) of

15  Title 18 in making a determination of what might be

16  appropriate.  That is important because it's incumbent upon

17  the Court to impose a sentence that is sufficient but not

18  greater than necessary to comply with the purposes set forth

19  in paragraph 2 of that subsection.

20        Now, there are several factors; and I'm going to

21  talk about a few of them.  The two that most people discuss

22  would be the nature and circumstances of the offense.  Now,

23  I'm not going to belabor that this afternoon.  I am simply

24  going to incorporate the stipulated factual basis which was

25  agreed to by you at the plea hearing, as well as paragraph 9

through 20 of the presentence investigation report, which you have not objected to in regards to this particular factor.

I would like to move on to the next factor, which is the history and characteristics that you present.  You are currently 23 years old.  You were born in Indianapolis.  Your parents did not marry, and you were raised primarily by your father who still lives in Indianapolis.

It is reported that your mother suffers from bipolar disorder and lives somewhere in California.  Your father is currently working part-time security at the State Fairgrounds. You have three siblings.  Your father and your siblings remain supportive of you.  The current whereabouts of your mother, as I've indicated, seem to be somewhat unknown.

You attended Broad Ripple High School in Indianapolis and graduated in 2010.  You have indicated a desire to learn about business and auto mechanics.  You have never been married, but you do have a child who is six from a relationship with Precious.

Prior to your arrest, you had custody of your daughter, as you've indicated.  Your sister, Natasha, has now stepped in to care for your daughter.

Other than episodes of coughing up blood, you report that you're in essentially pretty good physical health, take no medication; and you are not currently seeing a physician. You have no history of any mental illness.  Although you have

experimented with marijuana, you have not used illegal substances since your daughter was born.  You do believe you do have an alcohol addiction, however.  You have not participated in alcohol treatment programs up until this time.

You report that up until a few weeks prior to your arrest on these charges, that you were working for your mother's ex-boyfriend at his upholstery business.

You have no prior convictions of a sexual nature, and a conviction for criminal mischief as a misdemeanor is your only conviction of any substance.  You also have two traffic offenses on your record.

The Court must look to a sentence, Mr. Williams, that reflects the seriousness of these offenses, promotes respect for the law and provides just punishment for the offense.

The offenses committed by you are particularly offensive because of the number of victims and minors involved.  You did not stop at producing child pornography. You actually had intercourse and sexual relations with some of your victims.  The fact that you can treat teenage girls in this manner while raising your own daughter is clearly troubling to the Court.

You were 20 and 21 years of age when these offenses were committed.  As Ms. Beitz represents in her sentencing memorandum and today, your age and I would say the closeness

1  of your age to your victims' ages may indeed be mitigating

2  factors in this case; but that presents a predicament for the

3  Court in this case.

4         Although you are a young man, you intimidated the

5  victims to perform sexual acts.  If you were in your late

6  twenties or older, the decision about appropriate sentence may

7  not be as hard to make as it is in this case.  The real

8  question, as suggested by the government, is will you hurt

9  more people upon your release from prison.  Given the

10  circumstances of these offenses, it appears that you do not

11  like women and enjoy dominating them in awful ways.

12         I would also like to mention that Ms. Beitz has

13  discussed the length of the sentence and has referenced life

14  expectancy, quoting Judge Posner.  I am aware of those

15  figures, and I have been taking those into consideration.

16         Ms. Beitz also lapses into a discussion of the

17  frontal lobe and its development.  I don't purport to know

18  much about those things, but I am aware that it is part of the

19  brain that says is this a good idea and what are the

20  consequences for my action.  It is not as well developed as a

21  child because the nerve signals from the frontal lobe to other

22  parts of the brain are sluggish because adolescents have not

23  developed what they call the white matter that allows the

24  nerve signals to flow freely.

25         I would also like to say -- and this has not been

brought up by either side -- that I do have some problem with the double counting of the advisory sentencing guidelines.  I believe it double counts the fact that you engaged in a pattern of sexual exploitation of a minor and are a repeat and dangerous sex offender of minors.  Although clearly this is a proper calculation under the advisory guidelines, you have no prior convictions of a sexual nature; and you appear to never have been investigated for sexual abuse.

Therefore, you are receiving two 5-point enhancements for the same offenses of engaging in the sexual exploitation of minors.  For that reason and because of the recommendations in the plea agreement, the Court feels a variance is appropriate.

I would also like to comment on some of the other things that Ms. Beitz has brought up; first, in regards to recidivism.  The Court is aware of the recidivism rates.  I believe that some of those rates that are generally accepted are not applicable to sexual predators, if you will, sexual crimes and crimes certainly of the nature that you stand convicted of this afternoon.

I do believe, as Ms. Beitz says, that some sex offenders are more dangerous than others.  I think that is a given.  Curiously, she talks about some of the parts of the study quoted by the government in regards to pedophiles and whether or not a pedophile is involved with prepubescent

1  minors under the age of 13.  Whether that's true, I guess I
2  don't need to go too much farther on that.
3      I also heard her when she talks about antisocial
4  personality and whether you qualify for that.  I'm not sure
5  that that's going to carry the day on either side of the
6  debate in this case.
7      I do think it is fantasy, however, to believe when
8  she talks about that -- your relationships with these victims,
9  I think that's pure fantasy.  You did not have a relationship
10 of any sort with these victims.
11     One of the things that I do think probably shines
12 through, though, is that her point in regards to attraction to
13 a child as opposed to attraction to a teenager.  I do believe
14 that that's critical to my assessment of what might be
15 appropriate here.  It would appear that when you were 21 or so
16 and the victims were seven years younger than you, six years,
17 five years, those types of things, that there is a difference
18 between that type of attraction and an attraction to a two- or
19 three- or four-year old which the Court has seen.
20     The Court must look to a sentence that affords
21 deterrence to criminal conduct and that's when we get into the
22 recidivism argument; and quite candidly, I don't think your
23 age can be used to alleviate the seriousness of these crimes.
24 If too much leniency is shown, then what is to stop other
25 young men from participating in the same types of heartless

1  crimes?

2          The Court must look to a sentence that protects the

3  public from further crimes that you might commit.  The

4  balancing test here is what is more important, to protect

5  society or to allow you another chance, as you have suggested,

6  in society; and I just with that point would be hoping that

7  you do not hurt someone else.  I believe that the scales tip

8  in favor of the former.  I believe that you do indeed pose a

9  considerable and menacing threat to the public at large at

10 this time.

11         I have read -- both sides have talked about those

12 victim impact letters, which I take as being critical to my

13 thought processes and what might be appropriate.  There is

14 absolutely no doubt that the impact on all of these victims

15 has been significant; and I'm including not just the

16 individuals involved, the girls, but their parents, their

17 school friends.  The impact goes out in a ripple effect that

18 impacts significant numbers of people, and the impact is also

19 great.

20         I'm not going to get into a discussion of girl No. 5

21 and the forcible rape.  I'm not sure that that is really

22 appropriate for today.  I am accepting the stipulated factual

23 basis and the contents of the pre-sentence investigation

24 regarding the offense.

25         I am also considering, however, the factor that

would provide you with needed educational or vocational
training, medical care or other corrective treatment in the
most effective manner.

In regards to unwarranted sentencing disparity,
we've talked a little bit about Shea.  Granted, I do have some
familiarity with that case as well as Finkbiner.  I am also
familiar with Newton as well.  I do think there is a
difference between you and Mr. Shea and that is the sheer
violence and the masochistic attitude that I saw prevalent in
Mr. Shea.  I'm not sure I see that.  At least it has not been
as well developed.

Mr. Finkbiner is another case.  He was older but
Mr. Shea was essentially just about your age, but I think his
acts against women and these victims were incredibly malicious
and masochistic.

The Court has considered each of the provisions in
determining your sentence and looked hard at the provisions of
3553(a).  I probably, again, should mention, Ms. Beitz'
discussion of the factual considerations regarding girl No. 5;
but as I indicated, I have read the analysis and I do not find
it persuasive either way.

As I indicated earlier, I will accept your pleas of
guilty, Mr. Williams; and I will order the entry of judgment
thereon, and I will be sentencing you pursuant to your plea
agreement.

1    Ms. Beitz, do you feel that I have addressed your

2  main arguments in mitigation of Mr. Williams' sentence in this

3  case?

4    MS. BEITZ:  Yes, Your Honor, you have.

5    THE COURT:  Pursuant then to the Sentencing Reform

6  Act of 1984, it will be the judgment of the Court that the

7  defendant, Austin Williams, be hereby committed into the

8  custody of the Bureau of Prisons to be imprisoned for a term

9  of 216 months on Counts 1, 2 and 3, concurrent to each other;

10  a term of 120 months on Counts 4 and 5, concurrent to each

11  other but consecutive to Counts 1, 2 and 3; and a term of 60

12  months on 6, 7 and 8, concurrent to each other and all other

13  counts, to produce a total of 360 [sic] months.

14    The sentence is indeed a variance based upon the

15  history and characteristics that I have previously mentioned,

16  the need to promote respect for the law, and the need to

17  provide just punishment.  I would be making the specific

18  recommendation that if Mr. Williams is otherwise qualified,

19  that he be incarcerated at the facility in Marion, Illinois.

20  I would be also specifically recommending the residential sex

21  offender treatment program.

22    I acknowledge that my experience has been that that

23  does not happen until the last, I believe, 36 months of his

24  incarceration.

25    The defendant shall pay to the United States a fine

in the amount of $1,500.  I am departing from the fine
guideline range based upon his financial resources and his
future ability to pay.  I find that he does not have the
ability to pay interest, and I will waive the interest
requirement.

He shall notify the Probation Department of any
material change in economic circumstances that might affect
his ability to pay this fine.

He shall forfeit all property seized during this
investigation.  Upon his release from imprisonment, he shall
be placed on supervised release for a term of life on each
count, to be served concurrently.  Within 72 hours of his
release from the custody of the Bureau of Prisons, he shall
report in person to the Probation Department in the district
to which he is released.

While on supervised release, he shall not commit
another federal, state or local crime.  He shall not possess a
firearm, ammunition, destructive device or any other dangerous
weapon.  He shall cooperate with the collection of a DNA
sample and shall refrain from any unlawful use of a controlled
substance and shall submit to one drug test within 15 days of
placement on supervised release and two periodic tests
thereafter as directed by the Probation Department.

To promote respect for the law, prevent recidivism
and abide in adequate supervision, he shall comply also with

1 the standard conditions of supervision as referenced in the

2 presentence investigation report.

3       Further, Mr. Williams is ordered to abide by the

4 following special conditions: No. 1, he shall provide the

5 probation officer access to any requested financial

6 information. The Court believes this is relevant, and I am

7 imposing this condition to assist the Probation Department in

8 verifying the legitimacy and the sources of the defendant's

9 income.

10       No. 2, he shall participate in a substance abuse

11 treatment program at the direction of the Probation

12 Department, which may include no more than eight drug tests

13 per month. He shall abstain from the use of all intoxicants,

14 including alcohol, while participating in a substance abuse

15 treatment program.

16       He will be responsible for paying a portion of the

17 fees of substance abuse testing and/or treatment in accordance

18 with his ability to pay. The Court is imposing this condition

19 to address the defendant's history of alcohol and marijuana

20 abuse.

21       No. 3, he shall submit to the search of his person,

22 vehicle, office, business, residence and property, including

23 computer systems and Internet-enabled devices whenever the

24 probation officer has a reasonable suspicion that a violation

25 of a condition of supervision or other unlawful conduct may

have occurred or be under way involving Mr. Williams.  Other
law enforcement may assist as necessary.

Mr. Williams shall submit to the seizure of any
contraband that is found and he should forewarn other
occupants or users that the property may be subject to these
searches.

The Court believes due to the nature of the instant
offense and the defendant's history of illegal drug use, that
this may assist the Probation Department in monitoring his
compliance with his supervised release conditions.

No. 4, Mr. Williams shall not possess or use a
computer, including any Internet-enabled device, unless
approved by the Probation Department.  If approved, the
defendant agrees to comply with the restriction and monitoring
program as directed by the Probation Department.  He will be
responsible for the costs associated with the program.

He shall advise the Probation Department of all
computers available for his use.  He shall warn other users of
the existence of the monitoring software placed upon his
computer.  Any Internet or any computer -- any computer or
Internet-enabled device may be considered contraband and
subject to being confiscated.  I am imposing this condition
based upon the instant offense involving the use of a
computer.  This condition will allow the Probation Department
to view the defendant's activities on the computer and ensure

1 that he has not resumed his criminal behavior.

2        No. 5, he shall participate in a program of

3 treatment for sexual disorders and shall comply with the rules

4 of the treatment program.  He shall pay a portion of the costs

5 in accordance with his ability to pay.

6        I authorize the release of the presentence report

7 and available psychological records to the treatment provider

8 as approved by the Probation Department.  I am imposing this

9 condition to assist in identifying treatment needs and to

10 identify any risks to the public.

11        No. 6, he shall not possess any pornography, erotica

12 or nude images if the same is detrimental to his treatment

13 progress as determined by the treatment provider.  Any such

14 material found in his possession shall be considered

15 contraband and may be confiscated by the Probation Department.

16 The Court is imposing this condition to support the goals of

17 sex offender treatment.

18        No. 7, he shall submit to routine polygraph

19 examinations as directed by the Probation Department.  I am

20 imposing this condition to hold Mr. Williams accountable

21 throughout his term of supervision and identify any missteps

22 or relapse.

23        He shall register as a sex offender with the

24 appropriate authorities of any state in which he resides, is

25 employed or attends school.  I am imposing this condition to

1  ensure the safety of the community and is in accordance with

2  federal and state law.

3          He shall not have any unsupervised contact with a

4  minor child.  Supervised contact with a minor child must be

5  approved in advance by the Probation Department.

6          Ms. Ivie, I would like the normal -- what I'm

7  calling the normal references made to children of his own

8  family.  If those contacts have been approved by those

9  individuals and they have notice of his supervision and the

10 charges in this case, then that prohibition is not necessarily

11 to prohibit contact with children in his family.

12         MS. IVIE:  Okay.

13         THE COURT:  You shall pay to the United States that

14 special assessment of $800.  Payment of the fine and special

15 assessment shall be due immediately and is to be made directly

16 to the Clerk of the United States District Court.

17         In regards to the restitution, can I see counsel for

18 just a moment.

19     *(A bench conference was held off the record.)*

20         THE COURT:  In regards to the restitution requested

21 by the government, which is done in a rather general fashion,

22 the Court will leave that issue open consistent with the

23 statute for a determinative period of time.

24         Anything further from the government, Ms. Larson?

25         MS. LARSON:  No, Judge.

1         THE COURT:  From the defendant, Ms. Beitz?

2         MS. BEITZ:  No, Your Honor.

3         THE COURT:  Mr. Williams, you will otherwise be

4 remanded into the custody of the United States Marshal pending

5 notification of the Bureau of Prisons.

6         I will also advise you, Mr. Williams, that you have

7 the right to appeal your conviction if you believe your guilty

8 plea was somehow unlawful or involuntary or if there was some

9 other fundamental defect in the proceedings that has not been

10 waived by your guilty plea.

11         You also have the right to appeal your sentence if

12 you think your sentence is contrary to law.  As you know, you

13 have waived those rights to appeal as part of your plea

14 agreement in this case.  Such waivers are generally

15 enforceable; but if you believe the waiver is not enforceable,

16 you can present that theory to the Court of Appeals.

17         With few exceptions, any Notice of Appeal must be

18 filed within 14 days of judgment being entered in your case.

19 If you cannot afford the filing fee or cannot afford to pay a

20 lawyer to appeal for you, the Court would appoint a lawyer to

21 represent you in this appeal.

22         Also, if you intend to appeal, I suggest you discuss

23 that with Ms. Beitz; and I will obligate her to file the

24 necessary notices in a timely fashion.  Good luck to you,

25 Mr. Williams.

1          COURT CLERK:  Please rise.  Court stands adjourned.

2     *(A discussion was held off the record.)*

3          MR. DEBROTA:  16 and 60, those are close.  In this

4    courtroom, they echo a bit; but the judge made clear he wanted

5    the aggregate to be 336.  So we're satisfied that's the

6    sentence.  The defendant is present.

7          MS. BEITZ:  Yes.

8          *(The proceedings were adjourned at 3:35 p.m.)*

1      CERTIFICATE OF COURT REPORTER

2

3          I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct copy of the transcript originally filed with

5    the clerk of court on November 6, 2014, and incorporating

6    redactions of personal identifiers requested by the following

7    attorneys of record: Steven D. DeBrota, in accordance with

8    Judicial Conference policy.  Redacted characters appear as a

9    black box in the transcript.

10

11

12      /s/ Cathy Jones                    December 2 2014
     _____
13    CATHY JONES, RMR, RDR, FCRR
      Official Court Reporter
14    Southern District of Indiana
      Indianapolis Division
15

16

17

18

19

20

21

22

23

24

25